IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Xcentric Ventures, LLC, an Arizona limited liability corporation, and Jaburg & Wilk, P.C., a professional corporation,

        Plaintiffs,

vs.

Shawn Richeson,

        Defendant.

No. CV10-1931-PHX-NVW

**ORDER AND OPINION**

**[Re: Motions at Docket 26, 27, 38, and 50]**

Before the Court is: **(I)** Xcentric's "Motion for Order to Show Cause Re: Contempt" (Doc. 26); **(ii)** Richeson's "Motion for Rule 11(c) Sanctions - Against Maria Crimi Speth & Jaburg and Wilk P.C." (Doc. 27); **(iii)** Xcentric's "Cross-Motion for Sanctions Pursuant to Rule 11, Fed.R.Civ.P." (Doc. 38); and **(iv)** Richeson's "Request for Admissions from Xcentric Ventures LLC. & Richeson's Motion to Allow Filing of All Discovery Exchanged Between All Parties (Exception to FRCP 5)" (Doc. 50).  The Court will deny these motions.

## I.    Background

### A.    The Parties' Early Dealings

Plaintiff Xcentric Ventures, LLC, is an Arizona company that owns and operates the consumer complaint website www.ripoffreport.com.  At some point in 2008, someone posted on Ripoff Report a number of complaints about a Texas computer services business known

1   as "Click a Nerd."  Click a Nerd is run by Defendant Shawn Richeson.  Richeson began

2   contacting Xcentric, requesting that Xcentric remove those postings.  Xcentric refused.

3           In September 2009, Richeson started communicating with Maria Speth, a partner at

4   Plaintiff Jaburg & Wilk, P.C.  Jaburg & Wilk is a law firm that frequently represents

5   Xcentric.  The nature of Richeson's early communications with Speth is not clear.[1]  In early

6   September 2010, however, Richeson informed Xcentric and Jaburg & Wilk that he had

7   created a website and made several web postings (*e.g.*, on blogs and comment forums)

8   intended to inform the public that Jaburg & Wilk "hires child molesters."  Richeson based

9   this accusation on the criminal history of David Gingras, a former Jaburg & Wilk attorney

10  and now general counsel for Xcentric.  Apparently, in 1999, Maricopa County had charged

11  Gingras with twelve counts of sexual conduct with a minor, but later dropped those charges.

12          Richeson sent frequent e-mails to Speth containing links to his various websites and

13  other postings.  In these e-mails, he offered to erase everything if Ripoff Report would

14  remove all references to him and his business.  If Speth could not convince Ripoff Report to

15  do so, Richeson threatened to use his SEO knowledge[2] to ensure that web searches for Jaburg

16  & Wilk would hit numerous sites detailing the criminal records of Jaburg & Wilk attorneys

17  and clients.  Richeson hoped to ensure that Jaburg & Wilk "couldn't get a client if they stood

18  on the corner with sign saying 'we sue for food.'"

19          Speth eventually convinced Xcentric to satisfy Richeson's demands, and Xcentric

20  reportedly removed the references to Richeson that Richeson had specifically pointed out to

21  Speth.  Apparently, however, other references remained, and Richeson then began

22  demanding removal of those as well.  When he did not receive a satisfactory response, he e-

23  mailed Jaburg & Wilk to inform them that he would go through with his "SEO war."

24

25  _____

26          [1]*But see infra* note 3 and accompanying text.

27          [2]SEO refers to "search engine optimization," a generic term for the various techniques
    one can use to increase the chances that a particular website will rank high in search results
28  on sites such as Google and Yahoo.

**B.      The Temporary Restraining Order**

On September 9, 2010, Plaintiffs filed a complaint against Richeson, and a motion for a temporary restraining order.  That same day, Judge Teilborg held a telephonic hearing on the temporary restraining order with Jaburg & Wilk (acting as counsel for itself and Xcentric).  Judge Teilborg subsequently signed Plaintiffs' proposed temporary restraining order with only minor modifications.  That order enjoined Richeson from:

> (1) Knowingly sending or causing to be sent any threatening communications (other than threats to engage in lawful activity) to Plaintiffs;
> (2) Knowingly sending or causing to be sent any threatening communications (other than threats to engage in lawful activity) to clients and/or potential clients of Plaintiffs;
> (3) Knowingly publishing or causing to be published any false or misleading communications about Plaintiffs and/or any clients and/or potential clients of Plaintiffs;
> (4) Intentionally interfering with the contractual relationship between Plaintiffs and their clients[.]

(Doc. 11 at 2–3.)   Plaintiffs delivered that order to Richeson via e-mailed PDF on September 10, 2010.  (*See* Doc. 14.)

**C.      Richeson's "Motion to Convert"**

On September 15, 2010, Richeson filed a combined answer and "motion to convert Plaintiff's [*sic*] TRO into a temporary injunction."  In that document, under the heading "II. Defendant's Motion to Convert Plaintiff's [*sic*] TRO in to a Joint Temporary Injunction," Richeson stated, "Defendant does hereby stipulate to the Plaintiff's [*sic*] pending application and motion for a temporary injunction during the advancement of this cause of action." (Doc. 15 at 10.)  Richeson went on to request "that this Court enter a temporary injunction prohibiting all parties" from posting or maintaining information about each other on the Internet.  (*Id*.)  On September 20, 2010, the Court denied Richeson's "motion to convert" as a procedurally improper method of stating a counterclaim.

1

### D.    The Preliminary Injunction Hearing

2

#### 1.    Richeson's Stipulation

3  On September 21, 2010, the Court held a hearing on whether the temporary restraining

4  order should be converted to a preliminary injunction.  Jaburg & Wilk represented itself and

5  Xcentric at that hearing, and Richeson appeared *pro se*.  When the Court asked Jaburg &

6  Wilk how it wanted to proceed, Jaburg & Wilk referred to Richeson's above-quoted

7  stipulation to the injunction.  The Court then questioned Richeson about this stipulation.

8  Richeson asked to withdraw the stipulation, attempting to explain that it was part of his

9  improperly filed (and now denied) motion for a cross-injunction.  However, Richeson

10  worded his explanation inartfully, and the Court did not understand it at that time.  The Court

11  therefore held Richeson to his stipulation.  (Doc. 33 at 5:2–6:15.)

12

#### 2.    The Court's Concerns

13  Much of the remainder of the preliminary injunction hearing involved the Court's

14  questions to Jaburg & Wilk about whether they could meet the amount-in-controversy

15  jurisdictional requirement.  Plaintiffs' complaint does not request actual (*i.e.*, economic)

16  damages, but only nominal, presumed, and punitive damages.  At the *ex parte* TRO hearing,

17  Plaintiffs explained that they chose not to request economic damages because they want to

18  avoid opening client and other business files to discovery.  (*See id*. at 10:17–21, 12:5–13:9.)

19  The Court therefore expressed concern at the preliminary injunction hearing regarding

20  whether nominal, presumed, and punitive damages could exceed $75,000.  The Court stated,

21  for example, "My concern with that is that every step of [the causation and damages analysis]

22  is sheer speculation."  (*Id*. at 33:6–7.)

23  The Court also questioned Plaintiffs about their second cause of action, a claim under

24  Arizona's anti-racketeering statute, A.R.S. § 13-2314.04.  The Court characterized this as

25  "the Arizona racketeering count . . . for theft," and asked, "What's being stolen from each

26  [plaintiff]?"  Plaintiffs' counsel responded, "Xcentric is forced by the extortion to alter the

27  postings on rip-off report web page.  So there's an active extortion that forces Xcentric

28  Ventures to give up, if you will, it's a valuable property in the postings on the internet."  (*Id.*

at 19:13–20:2.)  The Court questioned whether such a theory could state a claim under the Arizona racketeering statute, but qualified, "Well, we're just having a highly preliminary discussion here, and I don't want you to take anything I'm saying, any questions I'm asking as reflecting any final resolution of anything.  [¶]  But I am highly skeptical of that as well." (*Id.* at 21:2–6.)

The Court concluded by taking Plaintiffs' motion for a preliminary injunction under advisement pending Plaintiffs' submission of a proposed form of injunction.

### E.  Plaintiffs' Contempt Motion & Richeson's Sanctions Motion

On September 29, 2010 (eight days after the preliminary injunction hearing), Plaintiffs moved for an order to show cause why Richeson should not be held in contempt of the temporary restraining order.  Plaintiffs attached two e-mails purporting to be from Richeson that post-date the temporary restraining order.  In the first e-mail, sent to Speth and various other individuals on September 12, 2010, Richeson stated:

> On Monday March 29th 2010 when we met during my deposition in Killeen Texas, I took the time to explain to [you] what you and your firm is [*sic*] doing to American Business. [¶] I pleaded with you to quit running an online extortion scheme and start building friends. [¶] You then posted my criminal record on US News. [¶] Did you honestly think I was going to bend over and take one up the ass?[3]

(Doc. 26 at 26.)  Richeson attached to this e-mail his answer to Plaintiffs' complaint, which he said he would not file for another day.  Richeson reiterated his demand that Ripoff Report remove every posting about him and his business, and told Speth, "I will give you and your firm one more chance to walk away from this without a blood bath. [¶] . . . [¶] When . . . your entire client base finds out what you did, you will lose and lose bad."  (*Id.*)

The second allegedly contemptuous e-mail was sent on September 26, 2010, to connect@12news.com, apparently an e-mail address for Phoenix's Channel 12 News.  Richeson also copied Speth and numerous other Jaburg & Wilk attorneys.  The e-mail began,

---

[3]The circumstances of Richeson's deposition and the "US News" posting are otherwise unexplained.

"I think this case is news worthy in Phoenix and would be very interesting to your followers."  It went on to claim that Jaburg & Wilk had sued Richeson "to cover up the criminal acts of attorneys and clients . . . . [¶] A Phoenix Federal Judge (Neil Wake) has found their claims to be merit less [*sic*]."  Richeson then accused Jaburg & Wilk of using Ripoff Report as "an online racketeering and protection scheme" in the sense that Jaburg & Wilk clients "will never end up on [Ripoff Report] and have essentially purchased mob style protection," whereas non-clients "will be posted about and extorted for money to remove the very postings [Jaburg & Wilk] create[s] or they have their surrogates create and they will in turn cover up the posters [*sic*] identity and claim they are immune from prosecution under the communications decency act section 230."  (Doc. 26 at 10.)

Richeson attached to this e-mail a Rule 11(c) motion for sanctions against Speth and Jaburg & Wilk which he had not yet filed with this Court, but which he did file on the same day that Plaintiffs filed their contempt motion.  The motion stated, among other things, that "[a]ll of the causes of action plead [*sic*] by Maria Speth were pointed out by the honorable Judge Neil Wake as having no merit and no factual basis to support them," and "[Jaburg & Wilk attorney] Adam Kunz testified [at the preliminary injunction hearing] that neither Plaintiff would ever be able to meet its Burdon [*sic*] of proof of this Court's minimal jurisdiction of $75,000.00."  (Doc. 27 at 1–2.)  The motion went on to repeat the substance of Richeson's allegations that Jaburg & Wilk runs Ripoff Report as an extortion scheme.

### F.    Richeson's Response to the Contempt Accusation

On October 8, 2010, Richeson filed a response to Plaintiffs' contempt motion.  Richeson's response does not deny that he sent the e-mails attached to Plaintiffs' motion.  Instead, Richeson denied falsity (*e.g.*, "None of the factual assertions in the Defendants [*sic*] email communication with all or any media source are knowingly false, misleading or calculated to interfere with the Plaintiff's businesses") or asserted that he spoke the truth (*e.g.*, "Jaburg and Wilk P.C. is in fact using the judicial process in furtherance of a racketeering scheme and there is ample prima facie evidence to support that").  (*See* Doc. 35.)

### G.    The Court's Denial of a Preliminary Injunction

Plaintiffs filed a proposed preliminary injunction, as requested, but on October 13, 2010, the Court issued an order denying the injunction. (Doc. 37.) The Court first found that it had erred in holding Richeson to his stipulation at the preliminary injunction hearing. Upon reviewing the hearing transcript, Richeson's basis for withdrawing his stipulation became clear and the Court determined that this was a valid basis to withdraw the stipulation. The Court therefore treated it as withdrawn. The Court then found that Plaintiffs' proposed preliminary injunction did not meet the specificity requirements of Fed. R. Civ. P. 65(d)(1)(B)–(C). The Court further found that the preliminary injunction raised a serious constitutional question, namely, whether it would act as a prior restraint on speech in violation of the First Amendment.

In denying the preliminary injunction, the Court necessarily dissolved the temporary restraining order. The Court noted that Jaburg & Wilk had worded the temporary restraining order even more broadly than the proposed preliminary injunction, and it raised the same constitutional concerns. The Court nonetheless reserved analysis of whether Richeson could still be held in contempt for alleged violations of the temporary restraining order while it remained in force.

### H.    Plaintiffs' Cross-Motion for Sanctions

On October 15, 2010, Plaintiffs responded to Richeson's Rule 11 sanctions motion, arguing that Richeson had not observed the 21-day safe harbor requirement found in Fed. R. Civ. P. 11(c)(2), and that Richeson's motion could be denied on its merits as well. Plaintiffs additionally cross-moved for Rule 11 sanctions against Richeson, arguing that his characterizations of this Court's statements at the preliminary injunction hearing were indefensibly false. (*See* Doc. 38.)

1

## I.      Plaintiffs' Contempt Reply

2       On October 18, 2010, Plaintiffs filed a reply in support of their contempt motion,

3  combined with a "notice of additional acts of contempt by Defendant Richeson prior to

4  October 13, 2010" (*i.e.*, the date the temporary restraining order dissolved).  Plaintiffs argued

5  that various cases authorize holding Richeson in contempt for violating the temporary

6  restraining order, even though this Court eventually found it invalid.

7       Plaintiffs also attached additional e-mails purporting to be from Richeson, one of

8  which is noteworthy here.  This e-mail, dated October 10, 2010, is addressed from Richeson

9  to Speth, copying numerous Jaburg & Wilk attorneys and at least 35 other e-mail addresses,

10 mostly associated with the Arizona Republic or the Phoenix Chamber of Commerce.  In the

11 e-mail, Richeson invited Speth to inspect www.jaburgandwilksucks.com for "any facts . . .

12 that are not 100% accurate."   Richeson went on to express his "sincere hope that [the

13 Chamber of Commerce] look[s] into your business practices and validate[s] the accusations

14 alleged by hundreds of victims across North America and those that I have alleged in your

15 hiring of child molesters and other similar type conduct."  (Doc. 40 at 16.)

16

## J.      Richeson's Response to Plaintiffs' Rule 11 Cross-Motion

17      On October 20, 2010, Richeson responded to Plaintiffs' Rule 11 cross-motion and

18 replied in support of his own motion.  Regarding his own motion, Richeson referred to this

19 Court's dialogue with Plaintiffs' counsel at the preliminary injunction hearing regarding

20 Plaintiffs' Arizona racketeering claim.  Richeson specifically quoted this Court's statement,

21 "'But I am highly skeptical of that as well.'"  (Doc. 42 at 3.)  Richeson went on to state that

22 he

23              was left with the impression that this Court had identified the
                offending pleading and wanted Adam Kunz and Maria Speth to
24              revisit their claims.

25              Mrs. Speth knew before filing her verified pleading that nothing
                had been stolen by Richeson.
26
                Now that this Court brought this fact to her attention, she failed
27              to revise and remove that cause of action from her verified

28

1    complaint and that is precisely what Richeson complains of and
2    asks that this Court enter sanctions for.

3    (*Id.*)

4    Concerning Plaintiffs' cross-motion for sanctions, "Richeson assert[ed] that all of
5    Richeson's claims in all of Richeson's pleadings are believed to be factually accurate . . . ."
6    (*Id.*)

7    **K.    Jaburg & Wilk's Settlement with Richeson**

8    On October 22, 2010, Jaburg & Wilk and Richeson jointly moved for a permanent
9    injunction against Richeson and dismissal of Jaburg & Wilk as a plaintiff, leaving only
10   Xcentric (still represented by Jaburg & Wilk) to litigate against Richeson. (Docs. 45 & 46.)
11   The Court held a hearing about this proposed settlement in which all parties agreed that the
12   settlement did not resolve the outstanding motions for contempt and sanctions. Xcentric still
13   wanted to pursue the contempt motion and cross-motion for sanctions, and Richeson still
14   wanted to pursue his motion for sanctions against Jaburg & Wilk as counsel for Xcentric.
15   The Court therefore agreed to grant the settlement motions and also to rule on the contempt
16   and sanctions motions.

17   **II.    Analysis of Xcentric's Contempt Motion**

18   Plaintiff Xcentric has requested an order requiring Richeson to appear and show cause
19   why he should not be held in contempt for violating the temporary restraining order. Given
20   that the temporary restraining order was invalid, the first question is whether the Court can
21   hold a party in contempt for violating an invalid order. The Court concludes that it does not
22   have such power. Xcentric cites various cases supposedly establishing otherwise (*see* Doc.
23   40 at 3), but all of Plaintiffs' cases trace back to three seminal Supreme Court decisions
24   relating to criminal contempt. *See Walker v. City of Birmingham*, 388 U.S. 307 (1967);
25   *United States v. United Mine Workers of Am.*, 330 U.S. 258 (1947); *Howat v. Kansas*, 258
26   U.S. 181 (1922). The *United Mine Workers* case makes clear that the propriety of civil
27   contempt, unlike criminal contempt, turns on the propriety of the order allegedly disobeyed.
28   *United Mine Workers*, 330 U.S. at 294–95. The Ninth Circuit acknowledges this distinction

1    between civil and criminal contempt. *See World Wide Rush, LLC v. City of Los Angeles*, 606
2    F.3d 676, 689 (9th Cir. 2010) (" [v]acatur of the injunction . . . voids the civil contempt
3    order"); *Kirkland v. Legion Ins. Co.*, 343 F.3d 1135, 1142–43 (9th Cir. 2003) ("Because . . .
4    the order . . . was an abuse of discretion, the corresponding [civil] contempt order cannot
5    stand."); *Davies v. Grossmont Union High Sch. Dist.*, 930 F.2d 1390, 1394 (9th Cir. 1991)
6    ("[T]he legitimacy of the [civil] contempt adjudication is based on the validity of the
7    underlying order."); *cf. In re Establishment Inspection of Hern Iron Works, Inc.*, 881 F.2d
8    722, 725 (9th Cir. 1989) ("the collateral bar rule permits a judicial order to be enforced
9    through *criminal* contempt even though the underlying decision may be incorrect and even
10   unconstitutional" (emphasis added)).

11       Here, Plaintiffs have asked only for civil contempt. Because the temporary restraining
12   order was not valid, this Court cannot hold Richeson in civil contempt for violating it. Nor
13   is the Court inclined to institute criminal contempt proceedings given the vagueness of the
14   temporary restraining order. The Court will therefore deny Xcentric's contempt motion.

15       ### III.   Analysis of Richeson's Sanctions Motion

16       Richeson asks for sanctions against Xcentric's counsel because, in his words, "[a]ll
17   of the causes of action plead [*sic*] by Maria Speth were pointed out by the honorable Judge
18   Neil Wake as having no merit and no factual basis to support them," and "[Jaburg & Wilk
19   attorney] Adam Kunz testified [at the preliminary injunction hearing] that neither Plaintiff
20   would ever be able to meet its Burdon [*sic*] of proof of this Court's minimal jurisdiction of
21   $75,000.00." He later redirected his argument to Xcentric's racketeering cause of action,
22   relying on the Court's preliminary expression of skepticism to justify his "impression that
23   this Court had identified the offending pleading and wanted Adam Kunz and Maria Speth to
24   revisit their claims."

25       Richeson does not contest that he failed to serve his sanctions motion 21 days before
26   filing it. *See* Fed. R. Civ. P. 11(c)(2). The Court must therefore deny Richeson's motion.
27   *Holgate v. Baldwin*, 425 F.3d 671, 678 (9th Cir. 2005) ("We enforce this safe harbor
28   provision strictly. We must reverse the award of sanctions when the challenging party failed

1   to comply with the safe harbor provisions, even when the underlying filing is frivolous."
2   (citations omitted)).

3        If Richeson had satisfied the 21-day rule, the Court would still deny his motion.  He
4   does not accurately report what opposing counsel and the Court said at the preliminary
5   injunction hearing, and the Court's skepticism does not otherwise render Xcentric's filings
6   frivolous.  Indeed, the Court stated, "Well, we're just having a highly preliminary discussion
7   here, and I don't want you to take anything I'm saying, any questions I'm asking as reflecting
8   any final resolution of anything."  Richeson's sanctions motion therefore offers no basis for
9   sanctions.

10              **IV.    Analysis of Xcentric's Sanctions Cross-Motion**

11       Xcentric argues that Richeson's sanctions motion is itself sanctionable for its
12  "statements regarding what occurred at the Preliminary Injunction hearing."  (Doc. 38 it 4
13  n.1.)  The Ninth Circuit permits the target of a sanctions motion to cross-move for sanctions
14  without waiting 21 days.  *Patelco Credit Union v. Sahni*, 262 F.3d 897, 913 (9th Cir. 2001)
15  ("A party defending a Rule 11 motion need not comply with the separate document and safe
16  harbor provisions when counter-requesting sanctions.").  Therefore, Xcentric's motion is
17  procedurally proper.

18       The Court will — in this instance — give Richeson the benefit of the doubt and
19  presume that he misunderstood what opposing counsel and this Court said at the hearing.
20  Richeson is not an attorney, and can be forgiven, to an extent, for reading more into others'
21  statements than was actually intended.  Accordingly, the Court will deny Xcentric's cross-
22  motion.   Richeson is reminded, however, that this Court's preliminary skepticism is
23  irrelevant to the outcome of this case.  If Xcentric's claims are unsupportable, as Richeson
24  believes, then Richeson must prove that.  The Court is neither party's ally in that task.

25

26

27

28

1

## V.    Analysis of Richeson's Motion to File All Discovery

2      On October 18, 2010, Richeson filed with the Court a set of requests for admission

3  directed at Xcentric's founder, Ed Magedson.  (Doc. 41.)  The Court struck that document

4  from the record, because "Mr. Magedson is not a party to this action" and "a party shall not

5  file discovery requests with the Court unless and until such requests are needed to dispose

6  of a motion."  (Doc. 44 at 1–2.)

7      Richeson then filed a set of requests for admission directed at Xcentric, adding to the

8  caption "& Richeson's Motion to Allow Filing of All Discovery Exchanged Between All

9  Parties (Exception to FRCP 5)."  (Doc. 50.)  Richeson did not explain why he wants to file

10  all discovery.  To the extent to Richeson hopes to use this Court's filing system as a public

11  repository for all information he gathers about Xcentric, the Court will not permit it.  The

12  Court will therefore deny Richeson's motion, and again strike Richeson's requests for

13  admission from the record.

14

## VI.    Order

15      IT IS THEREFORE ORDERED that Xcentric's "Motion for Order to Show Cause

16  Re: Contempt" (Doc. 26) is DENIED.

17      IT IS FURTHER ORDERED that Richeson's "Motion for Rule 11(c) Sanctions -

18  Against Maria Crimi Speth & Jaburg and Wilk P.C." (Doc. 27) is DENIED.

19      IT IS FURTHER ORDERED that Xcentric's "Cross-Motion for Sanctions Pursuant

20  to Rule 11, Fed.R.Civ.P." (Doc. 38) is DENIED.

21      IT IS FURTHER ORDERED that Richeson's "Request for Admissions from Xcentric

22  Ventures LLC. & Richeson's Motion to Allow Filing of All Discovery Exchanged Between

23  All Parties (Exception to FRCP 5)" (Doc. 50) is DENIED.

24

25

26

27

28

1    IT IS FURTHER ORDERED that Richeson's "Request for Admissions from Xcentric

2  Ventures LLC. & Richeson's Motion to Allow Filing of All Discovery Exchanged Between

3  All Parties (Exception to FRCP 5)" (Doc. 50) is STRICKEN.

4    DATED this 8th day of December 2010.

5

6

7                    /s/  JOHN W. SEDWICK
                UNITED STATES DISTRICT JUDGE
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28